**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| RONALD MANGLIARDI, | ) | |
| | ) | |
| Plaintiff, | ) | No. 12 C 1275 |
| | ) | |
| v. | ) | Magistrate Judge Cole |
| | ) | |
| CAROLYN W. COLVIN[1], Commissioner of Social Security, | ) ) ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

The plaintiff, Ronald Mangliardi, seeks review of the final decision of the Commissioner ("Commissioner") of the Social Security Administration ("Agency") denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 423(d)(2). Mr. Mangliardi asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

**I.**

**PROCEDURAL HISTORY**

Mr. Mangliardi applied for DIB on September 30, 2008, alleging that he had become disabled on August 18, 2006, due to degenerative disc disease, radiculitis, and a herniated disc in his back. (Administrative Record ("R.") 142-43, 180). His application was denied initially and upon reconsideration. (R. 57-58, 70-75). Mr. Mangliardi continued pursuit of his claim by filing a timely request for a hearing. (R. 81-95).

---

[1] Pursuant to Federal Rules of Civil Procedure 25(d), we have substituted Carolyn W. Colvin for Michael J. Astrue as the appellee.

An administrative law judge ("ALJ") convened a hearing on August 11, 2010, at which Mr. Kujawski, represented by counsel, appeared and testified. (R. 28-56). In addition, Mr. Mangliardi's wife also testified and James Breen testified as a vocational expert. On September 9, 2010, the ALJ issued a decision finding that Mr. Mangliardi was not disabled and not entitled to DIB because he retained the capacity to perform light work with certain postural restrictions. (R. 13-27). This became the final decision of the Commissioner when the Appeals Council denied Mr. Mangliardi's request for review of the decision on December 21, 2011. (R. 7-11). *See* 20 C.F.R. §§ 404.955; 404.981. Mr. Mangliardi has appealed that decision to the federal district court under 42 U.S.C. § 405(g), and the parties have consented to the jurisdiction of a Magistrate Judge pursuant to 28 U.S.C. § 636(c).

## II.
## THE EVIDENCE

### A.
### The Vocational Evidence

Mr. Mangliardi was born on June 30, 1971, making him thirty-nine years old at the time of the ALJ's decision. (R. 142). He has a high school education. (R. 186). His work history consists of heavy work, driving a truck and delivering drywall. He had to frequently carry over 50 pounds and sometimes lifted weights of over 100 pounds. (R. 181-82). He held that job for thirteen years until he injured his back. (R. 34). He stopped working for good in February of 2007. (R. 180).

### B.
### The Medical Evidence

Mr. Mangliardi went to see Dr. Chang on September 19, 2006, after experiencing low back

2

for a month. He reported that he injured his back at work on August 18th. Examination revealed minor tenderness and minor limitation of range of motion. Neurological exam was normal. An MRI from September 6th showed mild degeneration at L4-5 and L5-S1, and residual S1-2 disc. Noting there were no neurological problems, Dr. Chang recommended physical therapy. (R. 474).

On October 23, 2006, examination revealed that Mr. Mangliardi had a moderate limitation in lumbar flexion and a marked limitation in extension. He had moderate limitations in side flexion and rotation as well. His strength was rated at 4-5/5 throughout. Physical therapy was discontinued due to lack of significant progress toward goals. (R. 479-80).

Dr. Angelopoulos reported on October 31, 2006, that Mr. Mangliardi continued to suffer low back pain which was worse with standing or walking. The pain did not radiate to the extremities. Mr. Magliardi was getting some relief from Vicodin. Physical therapy did not provide much improvement. Dr. Angelopoulos noted that the September MRI showed small disc bulges at L4-5 and L5-S1. There was tenderness and muscle spasticity in that area. Range of motion studies reproduced pain at just 10 degrees flexion. Gait, sensation, and motor function were normal. Dr. Angelopoulos fitted Mr. Mangliardi with a brace and scheduled steroid injections. (R. 472). Mr. Mangliardi received epidural steroid injections on November 8th and 27th. (R. 476-77).

As of December 8, 2006, functional capacity evaluation rated Mr. Mangliardi capable of medium work, but this was still short of the demands of his job. (R. 485). Physical exam at that time was unremarkable – range of motion was normal. (R. 485). Mr. Mangliardi's gait was odd, however, as he tried to walk without touching his right heel to the ground as though he had some painful heel condition. No reason for this could be uncovered, however. (R. 485). He began a work conditioning program. (R. 485).

A January 4, 2007 functional capacities evaluation found Mr. Mangliardi ready to return full duty and perform very heavy work. (R. 491). His gait was at times dysfunctional, but it was steady as he carried loads up to 70 pounds. (R. 491). He was able to evenly distribute his body weight when lifting 110 pounds from the floor to his hips. (R. 491). He was discharged from the work hardening program. (R. 488). Dr. Chang released Mr. Mangliardi for work for a trial period of one month. (R. 470).

X-rays in February 2007 revealed moderately advanced spondylosis at L3-S1 with some scoliosis consistent with muscle spasm. (R. 463). In March 2007, x-rays of Mr. Mangliardi's feet revealed no problems. (R. 462). Mr. Mangliardi was fitted with orthotics to improve his gait. (R. 461). On April 9, 2007, Dr. Montella reported it was unreasonable for Mr. Mangliardi to participate in work in any way. (R. 458). The doctor stated that surgical intervention was a medical necessity on May 7, 2007. (R. 457).

Mr. Mangliardi underwent lumbar disc decompression at L3-4 and L4-5 on May 9, 2007. (R. 464-65). As of July 27, 2007, Mr. Magliardi was "trending toward improvement" but still could not perform any level of work. (R. 454). That remained Dr. Montella's assessment through September, when he noted that Mr. Magliardi was still having difficulties that were severe and debilitating. (R. 452). He was still ordered off any work through October. (R. 422-23).

On November 29, 2007, Dr. Montella reported that surgery went well but Mr. Mangliardi was nonetheless left with a severe and debilitating functional impairment. There was almost no chance he could ever return to heavy physical labor and would need to make a vocational change to something that did not put undue stress on his back. (R. 467). But, at that point, he could do no work – not even light duty work. (R. 466).

On March 12, 2008, Mr. Mangliardi underwent another functional capacity evaluation. It was determined that Mr. Mangliardi could not return to his heavy work but could perform "work in the light work category." (R. 394-95). The report added that there would have to be certain job modifications "as outlined in the following section" but the report included no following section. (R. 395). On April 17, 2008, Dr. Montella noted that Mr. Mangliardi was having ongoing difficulties with lumbar discogenic pain. He had been compliant with treatment but was only 60% functional. He was permanently restricted to light duty as per the April functional capacity evaluation. (R. 363).

On June 4, 2008, Dr. Montella noted that Mr. Mangliardi had a history of "a lot of difficulties with activity related pain." He was managing it with therapy and low-dose narcotic pain medication. Physical exam was unchanged. Dr. Montella said he was "in support of his disability application." (R. 362). On December 17, 2008, Dr. Montella reported that Mr. Mangliardi was having "ongoing difficulties that are severe and debilitating." The doctor again stated he was in support of his application for disability. (R. 509). Dr. Montella reported on February 19, 2008, that they would continue to help him with his pain medication and disability. (R. 510).

Dr. Sarat Yalamanchili examined Mr. Mangliardi consultatively for the disability agency on December 19, 2008. There was no tenderness in the back or evidence of spasm. Mr. Mangliardi had difficulty getting on and off the exam table. Straight leg raising was positive at 20 degrees left and 40 degrees right. Lumbar flexion was limited to just 40 degrees, with extension just 5 degrees. The doctor noted that Mr. Magliardi stood with his knees bent slightly, saying that his back hurt if he stood normally. He had a right-sided limp, but did not require a cane. (R. 514).

On January 7, 2009, Dr. Sumantra Mitra reviewed the record on behalf of the disability

determination service. She determined that Mr. Magliardi could perform light work that did not involve any climbing of ladders ropes or scaffolds, and only occasional climbing of ramps or stairs, stooping, kneeling crouching, or crawling. (R. 518-19). Dr. Towfig Arjmand reviewed the record on March 10, 2009, and affirmed the review of January 7, 2009. (R. 529-30).

Dr. Montella's examination was essentially normal on September 30, 2009. (R. 536-38). On October 26, 2009, Dr. Montella reported that Mr. Mangliardi's pain was intractable. He was able to sit or stand for no more than 15 minutes at a time. The doctor felt he was unable to work at any job due to the distraction and fatigue resulting from the constant and severe pain, impaired concentration and debilitating fatigue due to inability to sleep (R. 531), and the side effects of his narcotic pain medication. (R. 534).

Mr. Magliardi saw Dr. Montella on March 31, 2010. The doctor noted Mr. Magliardi was still having back pain and radiating leg pain. There was mild tenderness on palpation, and limited lumbar flexion and extension. Sensation, strength, and reflexes were normal. Straight leg raising was normal. Gait and station were normal as well. (R. 547).

## C.
## The Administrative Hearing Testimony

### 1.
### The Plaintiff's Testimony

At his hearing, Mr. Mangliardi testified that he was married and had a daughter. He had a high school education. Although he alleged he became disabled in August 2006 when injured at work, Mr. Mangliardi explained that he did return to work for about three weeks in January 2007, but then went down again. He had not worked at all since then. (R. 33).

Mr. Magliardi testified that he had surgery and extensive physical therapy but it had not

helped. (R. 35). He still had back pain and it shot down his legs. The pain was constant and he rated it a 7 out of 10. (R. 36). He could only stand for 15 minutes. He could walk about a block. He could sit for about 20 minutes. (R. 37). Mr. Mangliardi said he took 4 Vicodin and 2 Naproxen daily. (R. 38). They made him "loopy." He also used a heating pad and an ointment. (R. 38).

Mr. Mangliardi was able to take care of himself and could mow part of the lawn with a riding mower for about 10 or 15 minutes. (R. 39). He had to sleep in a recliner. (R. 39). He didn't do much during the day, alternating sitting in the recliner, kitchen chair, and lying on the couch. He mostly watched TV. (R. 40-41). He occasionally drove to his doctor or to his grandparents' house. They were nearby, but the doctor was about a half hour away. (R. 41). He went every six months. (R. 38). Ms. Mangliardi corroborated her husband's testimony, adding that he sometimes fell trying to get out of his chair. (R. 39).

Mr. Mangliardi testified that he had handicap toilets installed at his home so he could get up more easily. (R. 44). He could only sleep in short stretches, no more than an hour or two at a time. (R. 45). He couldn't lift anything more than a quart of milk. (R. 46).

## 2.
### The Vocational Expert's Testimony

The vocational expert, Mr. Breen, then testified. Mr. Breen said that Mr. Mangliardi's past work delivering drywall was generally semiskilled, medium level work, but heavy as Mr. Mangliardi performed it. (R. 49). The ALJ then asked Mr. Breen whether a person who could perform light work that did not involve any climbing of ladders ropes or scaffolds, and only occasional climbing of ramps or stairs, stooping, kneeling crouching, or crawling, could perform any work that existed in significant numbers in the economy. (R. 50). The VE said they could perform jobs like cashier

– 1300 jobs locally and 24,000 regionally – fast food worker (650 and 50,000), or housekeeper (500 and 22,000). (R. 50). If that same person could only be on their feet for 20 minutes and could lift no more than 10 pounds, they could still perform jobs like information clerk (400 and 3500), order clerk (110 and 5500), or eye glass assembler (20 and 2000). (R. 50). If someone had to lie down as often as Mr. Mangliardi claimed he had to, they would be unemployable. (R. 84).

## III.

### The ALJ's Decision

The ALJ found that Mr. Mangliardi suffered from a severe vertebrogenic disorder. (R. 19). The ALJ next determined that this impairment did not meet any listing, specifically listing 1.02, covering major dysfunction of a joint, because he was able to ambulate effectively. (R. 19). The ALJ based this finding on the opinions of the disability determination services medical consultants. (R. 19). The ALJ went on to find that Mr. Mangliardi retained the capacity to perform light work, as long as it did not involve any climbing of ladders, ropes, or scaffolds, or more than occasional stooping, kneeling, crouching, crawling, climbing stairs, or climbing ramps. (R. 19). The ALJ summarized Mr. Mangliardi's complaints, and then said that his impairment "could reasonably be expected to cause the alleged symptoms; however, his statements concerning the intensity, persistence and limiting effects of his symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (R. 20). The ALJ then discussed the medical evidence, noting that Mr. Mangliardi had undergone various treatments for his back, including chiropractic treatment, medication, physical therapy, epidural injections, and finally a lumber disc decompression. The ALJ also noted that, following surgery, Mr. Mangliardi's doctor initially indicated it was unreasonable for him to participate in any work activity. Thereafter,

however, the doctor said he could work with permanent restrictions at a light work. (R. 21). The ALJ added that the disability determination services medical consultants found Mr. Mangliardi could perform light work subject to postural limitations: no climbing ladders, ropes, or scaffolds; and no more than occasional stooping, crouching, crawling, or climbing of ramps or stairs. (R. 21).

Finally, the ALJ summarized the vocational expert's testimony that a person with Mr. Mangliardi's limitations could not perform his past work but could still perform a number of jobs – like cashier, fast food worker, and housekeeper – that existed in significant numbers in the local and regional economies. (R. 22). Even if such a person were limited to being on their feet no more than 20 minutes at a time and lifting no more than 10 pounds, they could perform jobs like information clerk, order clerk, or eye glass assembler. (R. 23). The ALJ accepted this testimony, and relied upon it to find Mr. Mangliardi not disabled and not entitled to benefits under the Act. (R. 22).

## IV.

### DISCUSSION

#### A.

#### The Standard of Review

The applicable standard of review of the Commissioner's decision is a familiar one. The court must affirm the decision if it is supported by substantial evidence. 42 U.S.C. §§ 405(g). Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008), *citing Richardson v. Perales*, 402 U.S. 389, 401 (1971). The court may not reweigh the evidence, or substitute its judgment for that of the ALJ. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009); *Berger*, 516 F.3d at 544. Where

9

conflicting evidence would allow reasonable minds to differ as to whether the claimant is disabled, it is the ALJ's responsibility to resolve those conflicts. *Elder v. Astrue*, 529 F.3d 408 (7th Cir. 2008); *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). Conclusions of law are not entitled to such deference, however, so where the Commissioner commits an error of law, the court must reverse the decision regardless of the volume of evidence supporting the factual findings. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

While the standard of review is deferential, the court cannot act as a mere "rubber stamp" for the Commissioner's decision. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). An ALJ is required to "minimally articulate" the reasons for his decision. *Berger*, 516 F.3d at 544; *Kujawski v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). Although the ALJ need not address every piece of evidence, the ALJ cannot limit his discussion to only that evidence that supports his ultimate conclusion. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ's decision must allow the court to assess the validity of his findings and afford the claimant a meaningful judicial review. *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009). The Seventh Circuit calls this building a "logical bridge" between the evidence and the ALJ's conclusion. *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996).

**B.**

**The Five-Step Sequential Analysis**

The Social Security Regulations provide a five-step sequential inquiry to determine whether a plaintiff is disabled:

   1) is the plaintiff currently unemployed;

   2) does the plaintiff have a severe impairment;

3) does the plaintiff have an impairment that meets or equals one of the impairments listed as disabling in the Commissioner's regulations;

4) is the plaintiff unable to perform his past relevant work; and

5) is the plaintiff unable to perform any other work in the national economy?

20 C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-13 (7th Cir. 2009); *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005). An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. 20 C.F.R. §416.920; *Briscoe*, 425 F.3d at 352; *Stein v. Sullivan,* 892 F.2d 43, 44 (7th Cir. 1990). A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled. 20 C.F.R. §404.1520; *Stein*, 892 F.2d at 44. The claimant bears the burden of proof through step four; if it is met, the burden shifts to the Commissioner at step five. *Briscoe*, 425 F.3d at 352, *Brewer v. Chater,* 103 F.3d 1384, 1391 (7th Cir. 1997).

## C.

### Analysis

Mr. Mangliardi has three problems with the ALJ's decision. First, he contends that the ALJ's determination that his impairment did not meet the listings was erroneous. Second, he argues that the ALJ failed to make a function-by-function analysis of his residual functional capacity. Finally, he contends that the ALJ's credibility determination was patently wrong. We focus on this last point because, as it turns out, it necessitates a remand.

In assessing Mr. Mangliardi's credibility, the ALJ employed the familiar boilerplate that the Seventh Circuit has bemoaned time and again: "the claimant's medically determinable impairment could reasonably be expected to cause the alleged symptoms; however, his statements concerning

the intensity, persistence and limiting effects of his symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (R. 21). The cart-before-the-horse phrasing is anathema to the Seventh Circuit; a red flag to a bull. *Moore v. Colvin*. 743 F.3d 1118, 1122 (7th Cir. 2014)("We have repeatedly condemned the use of that boilerplate language because it fails to link the conclusory statements made with objective evidence in the record."); *Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir.2012)("It puts the cart before the horse, in the sense that the determination of capacity must be based on the evidence, including the claimant's testimony, rather than forcing the testimony into a foregone conclusion."); *Bjornson v. Astrue*, 671 F.3d 640, 644–46 (7th Cir.2012)("The Social Security Administration had better take a close look at the utility and intelligibility of its 'templates.'"); *Parker v. Astrue*, 597 F.3d 920, 922 (C.A.7 (Wis.),2010)("It is not only boilerplate; it is meaningless boilerplate."). But, still, despite warning after warning from the Seventh Circuit, the phrasing continues to habitually appear in ALJ's decisions. One might almost suspect that it is inserted intentionally just to raise the Court's hackles.

      Contrary to what many Social Security disability lawyers appear to think, however, given their rote insertion of the "boilerplate" argument in their briefs – by now, boilerplate itself – the boilerplate is not toxic. Almost invariably, the ALJ will follow up the offending phrasing with reasons for finding the claimant not credible. When they do so, the boilerplate is not a problem, it's no more than a pet peeve. *See Pierce v. Colvin*, 739 F.3d 1046, 1050 (7th Cir. 2014); *Schomas v. Colvin*, 732 F.3d 702, 708 (7th Cir. 2013); *Pepper v. Colvin*, 712 F.3d 351, 367–68 (7th Cir.2013); *Filus*, 694 F.3d at 868. Often, this line of cases is unfortunately ignored and boilerplate arguments are employed where they don't belong and where their rejection is preordained. It's a pointless but persistent tactic that does nothing to help one's position. *See Walker v. Abbott Laboratories*, 416

F.3d 641, 643 (7th Cir.2005); *Rehman v. Gonzales*, 441 F.3d 506, 508-09 (7th Cir.2006); *United States v. Mahoney*, 247 F.3d 279, 282 (D.C. Cir. 2001); *Rice v. Nova Biomedical Corp.,* 38 F.3d 908, 918 (7th Cir. 1994); *United States. v. Brocksmith,* 991 F.2d 1363, 1366 (7th Cir.1993); Matthew Kennelly, *Over-Arguing Your Case*, 40 LITIGATION 41 (Winter 2014).

In this case, however, the boilerplate argument is a better fit than usual. After robotically reciting the offensive phrasing, the ALJ simply recounted the medical evidence, and said that Mr. Mangliardi's testimony "when compared against the objective evidence and evaluated using factors in SSR 96-7p, was not credible in view of, especially, the lack of supporting findings in the medical records." (R. 21). But the ALJ didn't discuss any other factors, just the medical evidence.[2] This, too, is a problem in the Seventh Circuit. While the Seventh Circuit has ruled time and again that a claimant's credibility may be undermined by the objective medical evidence, *see, e.g., Pepper,* 712 F.3d at 368; *McKinzey v. Astrue,* 641 F.3d 884, 891 (7th Cir. 2011); *Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008); *Sienkiewicz v. Barnhart,* 409 F.3d 798, 804 (7th Cir. 2005), the court has also ruled that an ALJ may not disregard a claimant's complaints of pain simply because they are belied by the objective medical evidence. *See, e.g., Moore,* 743 F.3d at 1125; *Pierce*, 739 F.3d at 1050; *Bjornson*, 671 F.3d at 646, 648; *Carradine v. Barnhart*, 360 F.3d 751, 753 (7th Cir. 2004).

Perhaps these rulings might be harmonized by taking the court to mean that the ALJ can point to the medical record as undermining a claimant's testimony only when the ALJ provides additional

---

[2] For example, the ALJ did not discuss Mr. Magliardi's course of treatment in the context of the believability of his testimony. The ALJ wrote the treatment off as "conservative" (R. 21), but surgery, repeated epidural steroid injections, and strong narcotic pain medication tend to support, rather than undermine, a claimant's allegations of intractable pain. *Carradine v. Barnhart*, 360 F.3d 751, 755 (7th Cir. 2004)(improbable that claimant would undergo these treatments, and doctors would prescribe them, simply to bolster their credibility).

13

reasons for doubting it. *See Pierce*, 739 F.3d at 1050(". . . an ALJ may not base a decision *solely* on the lack of objective corroboration of complaints of pain."(emphasis supplied)).

Still, the court has seemingly upheld credibility determinations based solely on the objective medical evidence on a number of occasions. *See, e.g., Outlaw v. Astrue*, 412 Fed.Appx. 894, 896 (7th Cir. 2011); *Getch*, 539 F.3d at 483; *Adkins v. Astrue*, 226 Fed.Appx. 600, 606 (7th Cir. 2007); *Sienkiewicz*, 409 F.3d at 804. Nevertheless, to uphold the ALJ's credibility finding here, in the face of cases like *Moore* and *Pierce*, would be unwarranted, especially in light of the ALJ's consideration of one crucial piece of medical evidence he relied upon to reject Mr. Mangliardi's allegations.

The ALJ focused on the April 2008 opinion from Dr. Montella that Mr. Mangliardi could do light work with certain other, unspecified restrictions and gave it controlling weight. (R. 21). But, in the context of the record as a whole, that was just a snapshot of Mr. Magliardi's condition at the time. Dr. Montella later said he was supporting Mr. Magliardi's disability application and authored an October 2009 opinion that Mr. Magliardi's pain was intractable and he was unable to do any type of work. The ALJ ignored these other assessments completely. That, the ALJ could not do. The Seventh Circuit has "repeatedly held that although an ALJ does not need to discuss every piece of evidence in the record, the ALJ may not analyze only the evidence supporting her ultimate conclusion while ignoring the evidence that undermines it." *Moore*, 743 F.3d at 1123; *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir.2009); *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir.2009). The ALJ must confront the evidence that does not support her conclusion and explain why that evidence was rejected. *Moore*, 743 F.3d at 1123; *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir.2004).[3]

---

[3] Of course, there might be any number of reasons the ALJ could have offered for according little or no weight to Dr. Montella's opinion that Mr. Mangliardi was disabled. Mr. Mangliardi completed a work
(continued...)

Accordingly, given that the ALJ relied too heavily on the medical evidence alone to reject Mr. Magliardi's testimony and ignored the medical opinions that ran counter to his decision, this case must be remanded.

## CONCLUSION

The plaintiff's motion for summary judgment or remand [Dkt. #18] is GRANTED, and the Commissioner's motion for summary judgment [Dkt. #21] is DENIED.

**ENTERED:** _____
UNITED STATES MAGISTRATE JUDGE

DATE: 6/20/14

---

³(...continued)
hardening program and functional evaluation that cleared him for light work. Doctors' examinations – including those of Dr. Montella – generally revealed that surgery had gone well and there were little or no objective problems. An ALJ may reject even a treating physician's opinion if it is inconsistent with the medical evidence or his own treatment notes. *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013); *Denton v. Astrue*, 596 F.3d 419, 424-25 (7th Cir. 2010);*Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir.2008). An ALJ can also reject a treating physician's opinion if it is based on his patient's subjective complaints. *Bates v. Colvin*, 736 F.3d 1093, 1100 (7th Cir. 2013); *Kettleboetter*, 550 F.3d at 625; *White v. Barnhart*, 415 F.3d 654, 659 (7th Cir. 2005). And, along these lines, an ALJ might question the validity of a treating doctor's dire assessment of his patient's capacity for work because treating physicians have been know to "bend over backwards" to do a favor for their patients and too easily deem them disabled. *Hofslien v. Barnhart,* 439 F.3d 375, 377 (7th Cir.2006). It looks like that might have played a role here, where Dr. Montella's examination results did not exactly jibe with his repeated statements that he was supporting Mr. Magliardi's claim for DIB. But, the ALJ offered none of these reasons and simply ignored those opinions where Dr. Montella said Mr. Magliardi was disabled.

15